First case in the morning call, Kelly Brunson v. Daniel B. Cothern, as trustee of the Valerie Cothern Women's Trust. Argument on behalf of the Avalon, Mr. Ryan E. Johnson. Argument on behalf of the Trust, Mr. Jeffrey M. McCarty. Good morning, gentlemen. Mr. Ryan, whenever, or I'm sorry, Mr. Johnson, whenever you are ready, may proceed. Not sure why I'm wearing these if they don't work. May it please the court, Ryan D. Johnson, on behalf of appellant Kelly Firmason. We're here this morning on an appeal on a 2615 motion, and the appellant is presenting five arguments this morning on why the motion to dismiss should be vacated or remanded back to the trial court. Our first argument is that the trial court erred in dismissing plaintiff's complaint, account one, for undue influence. There are several misrepresentations and statements made by, at least they're alleged to be made by the defendant in this case, Daniel Cothern, the son of the decedent, back around the time that the trust was drafted. The second point for appeal is that the trust should be set aside, or not set aside, excuse me, reformed due to mistake, due to some drafting, potential drafting errors in the trust. Go back to your first point. I know there's five things you want to offer. While you're on your first point, as I was looking at the record, looking at the briefs, are there any allegations that the defendant specifically advised the decedent to draft a living trust and disinherit the plaintiff? Is there any allegation that the defendant specifically did that? I don't believe there's an allegation that he specifically said those words. There's a totality of circumstances and allegations that show a very difficult marriage that my client had with her ex-husband, Rick Firmason, around this same time. At the time this trust was executed, what was the status of her marriage? They had been separated. I don't know if they had been officially divorced yet. I don't remember the exact date of the divorce, but they had been separated in about 1998, 1999. That's when Kelly, my client, moved in with her mother, kind of as a safe haven away from Mr. Firmason. And, again, this is about the same time that Valerie Cothern, who is the decedent in this case, had her own issues with Rick Firmason. It's very serious issues. Unfortunately, he's a very difficult person to say the least. So wouldn't it make sense that Mom would execute the will, leaving the daughter out in fear that the son-in-law gets her money? Because at that point, really, the marriage was up in the air. They weren't divorced yet, correct? Well, whether they were divorced or not officially, I think it was clear to everybody involved that the relationship was over. There were protections that had been filed. In fact, there was a DCFS case that, well, in fact, two DCFS cases that were improperly initiated by Rick Firmason. And, in fact, one of them was initiated about a week prior to this trust being drafted. Well, is it safe to say that the decedent had this overwhelming fear of her daughter's husband or soon-to-be ex-husband getting his hands on the money, correct? Well, I think it's fair to say she had a fear of him. And I think the allegations bear out that it was Daniel Cothern who actually put a little bit of an extra fear in Valerie's mind that if you don't disinherit Kelly, then potentially Rick Firmason is going to inherit some of the time. Let's say he did that. Let's say he did that. Let's assume you can prove that he did that. Does that in and of itself constitute undue influence? I think it can, Mr. Justice. And the reason is because of some of the case law that obviously I've cited in the brief, Hoover case, DeHart, obviously, and even DiMatteo from the First District. You bring up a good point, DeHart. I think DeHart can be distinguished from this case. She executes this trust because, as you say, the brother says, oh, her ex-husband or her husband might get some of the money. Fifteen years later, he doesn't see her for, like, 15 years, correct? By he, do you mean the son? Yes. I think he saw his mother now and again. I don't think it was the full 15 years. Or do you mean Rick Firmason? No, I mean the son. Okay. How is it that at that point, she didn't, if she wanted to change her mind, she was not under, if you were going to argue, she was under undue influence, she couldn't exercise her free will. How could she not have exercised her free will from the time she wrote that trust until the day that she died, when she had very little contact with the son? That's a fair point, Madam Justice. Obviously, she did have a lot of time in between the drafting of this trust and the day of death. Which would distinguish this from DeHart. It would, correct. I believe in DeHart, it was a short period of time after. Yeah. And another issue in this case is whether there was another trust ever drafted. It's a due diligence done by Mr. Coffner to find that trust. No will has ever been probated or filed into probate. So that's another issue that we brought up in this matter. How does that help you? What's your point on that? My point on that is that if there was a subsequent document, we just don't know if there's been any due diligence to find out. Maybe she did change it back and bring Kelly back into the fold, either through a will or trust. Whose burden would it be to unearth that? Well, it would be our burden through discovery. But right now, we're only at the pleading stage, so we haven't been able to get that far yet. Let's talk about that free agency. Because the case that you correctly stated, to aver undue influence, facts must be stated warranting the conclusion that the testator was thereby deprived of his or her free agency. So if he says, you know, ma, this is a bad person here, and we don't want him to get his hands on your money, where is the overwhelming undue influence that deprives her of her free agency? And people would say that in ordinary family discussion, wouldn't they? I mean, somebody you know who's in a bad marriage, they want to get out, and you're concerned about the relationship and the finances. Wouldn't somebody be likely to say to their relative, hey, you know, be careful. This person could end up with your money. Is that going to be enough to carry the debt? Well, I think it's certainly a misrepresentation made by Mr. Cothern, and certainly not the only one. Again, using the case law cited in the brief, I think the cases do say that a misrepresentation of that type, you know, can be enough to create an undue influence over the testator. And I don't believe, at least I don't remember anything in the case law stating there has to be more than one misrepresentation. I believe it said, you know, a misrepresentation. And going back to the Hoover standard that says, you know, any improper urgency of persuasion whereby the will of the person is overpowered. So we have the influence of Mr. Cothern over his mother saying, you know, if you don't do something about your estate plan, you know, percentage of your estate that you've worked hard for. But you don't have any evidence. He said, give me all of your money, otherwise he's going to end up with it. If you don't do something with your estate plans, she could have put it in trust and fed the daughter a little bit at a time or done some other things. She didn't do that. She had other options with her estate plan other than disinheriting the daughter totally, correct? That is correct. And, in fact, one of our points in the estate section is that she didn't disinherit Kelly. At least, obviously the trust doesn't leave it for her. Right. Somebody could have crafted that a little bit more specific, which is often the case in will cases that are litigated. But in this case, though, and I think what Justice Hudson was kind of alluding to, is the will, one of the factors in the DeHart, they lay out some factors on how you can make a determination if there's under influence. One of them is if the will is prepared by or its preparation is procured by the beneficiary. So is there any testimony, and I have seen no affidavits by whomever it was that prepared this trust and said that the son had brought her in or he had spoken to the son. Is there any evidence like that that I'm not seeing? I don't have any evidence to that effect. How old were the Firmas and Children in 2001 when the trust was signed? Kelly is 51 now, so she was early 30s. So they were still minors? No. The Firmas and Children? The Firmas and Children would have been in their early 30s. Kelly and then Kelly's kid. Oh, Kelly's kid. I'm sorry, the grandchildren. Yes. They were very young. And the trust says that each grandchild who survives shall receive a portion of the estate. Correct. Has that ever happened? It's still being litigated. We're in the process of trying to get an accounting and find out exactly what's in the estate and then get the 6% to each grandchild. In fact, Tristan, who's the older of Kelly's two sons, is finishing college now and we believe that there is a college fund that Valerie has set up and we're attempting to get that money for Tristan. Austin, I believe, is a sophomore or junior this year in college. So we're trying to get that money as well. Another way that Rick Firmason could get a piece of this particular estate would be through his minor children as well, correct? Even though there may have been custody issues and things of that nature, he still was their father. He was and still is. What's the status of their marriage now? They were divorced many years ago. There's no communication between the two of them. Rick Firmason's had numerous legal problems. He has no relationship with Kelly, has no relationship with his kids. I don't think it's kids. They may have seen him now and again over the years. I just didn't know if they were eventually divorced. Yes, they absolutely were. Counsel, did you allege in your pleadings that the defendant spent a lot of time with the decedent around the time that she executed her will? Is that in your pleadings? Correct. At the time she executed the trust, the pleadings state that he did not have and this is also borne out by the affidavit of Mr. Wargo, where she didn't have a very close relationship with Dan up to about this time where Kelly and Rick started having the issue with their marriage. Then Dan came around a lot. He was at the house a lot. In fact, he moved in for a short period of time. Then after this trust was drafted, He sort of disappeared a little bit. Exactly, Mr. Justice. The allegation is that then he went back to how he was before, coming by the house maybe once or twice a year, not even coming over for her birthday when she had cancer a few years ago. He didn't really help his mother out at all. It was Kelly's the one that took her to the doctor, made sure that she was recovering. Kelly lived with her mother for I think it was 17 years before she passed. Was Kelly during that period of time paying, does the record as we have it today, was Kelly paying expenses while she and the boys were living there in those years when she was helping to take care of Valerie? Well, she paid her general expenses. I don't know if the record bears out exactly who was paying what, but in terms of she did live effectively, I guess, mortgage-free or rent-free with her mothers as far as I understand. She was obviously taking care of her own boys, and then she has been employed for those 17 years. What was the status of the relationship between the decedent and her daughter while she was living there? Sometimes family members living together, as you know, may not get along that well. Sometimes that can have the opposite effect on a good relationship. So what did you allege there? That they had a very close and loving relationship. Allegations bear out that they talked several times a day even though they lived together. They were very close. Valerie was very close with her two grandchildren. Kelly used to take her mom, you know, simple things like to dinner, shopping. They did a lot of activities together. And I think that's one of the similarities to the case law is that the close relationship between the decedent and the plaintiff in this case is similar to the case law. And it, again, points to the fact that it would be unusual for Valerie to then disinherit her daughter who she lived with and was very close with for the extent of her life. Perhaps she felt she got all that free rent all those years. Well, that is certainly an argument that the appellee has made in this case. And I don't disagree with that argument if the trust was drafted later on. But she drafted this thing in 2001. Now, she didn't know at that time that Kelly may live with her for the next 15 to 17 years. You can understand how anyone could be a little troubled over the fact that this woman was free and clear to do what she wanted to do. The son wasn't around, but yet she never changed the trust. I can certainly appreciate that point. And, again, I think there needs to be a little more due diligence done to find out exactly if there was another will or trust that was ever drafted. Again, there's no will that's been entered into probate in this case. Even though the trust directs that maybe there was no will drafted. I mean, we just don't know at this point. We haven't gotten into discovery to find out. In 2015, there was some minor work done, probably decoration to the house, painting. And some painter had a conversation with the decedent about Kelly and Dan getting the house. She didn't really care what it looked like or what the paint looked like. How did that come about? Correct. That's in the affidavit of Mr. McGill, who did come over to do some work for Kelly and her mother. And he had a bit of a relationship with Valerie. And I don't know exactly how the conversation started, but at some point during the conversation, she mentioned to him that, well, it doesn't matter. Go ahead and finish your thought. May I finish? Yes. Thank you. That Valerie had said to him, well, Dan and Kelly are going to get the house, so it doesn't really matter. Let them deal with it. And there was no other conversation other than that? The painter just went back to painting, and that was the extent of it? Well, there may have been other conversations with Mr. Wargo. I believe it was Mr. Wargo that talks about the Hummel collection that had been mentioned. Oh, dear Lord, you can't even give those Hummels. Yes, I know. My grandma had several of them. Are we supposed to take judicial notice of that? If you'd like to, Mr. Jim. I believe my time is up. I have one further question, if I might. You also alleged tortious interference. Correct. If you don't prove undue influence, isn't it difficult to prove tortious interference? And the factors in tortious interference seem a little more difficult than undue influence because it requires tortious interference as tortious conduct, such as undue influence for auto duress. What do you feel you have alleged that would prove tortious interference? The allegations are going to be similar to the undue influence allegations. I would certainly concede that. Obviously, it's a tort with money damages versus the rescission of the trust. But, yeah, the expectation that she was in a will, at least allegedly in 1994, that she was a power of attorney for her mother's financial and health care affairs and that due to Mr. Cothern's alleged acts around that time with the drafting of the trust that it, you know, interfered with her expectation of an inheritance. Those powers never changed throughout the period of time that Kelly lived with her mother, did it? I believe that's correct. Okay. Justice Sotomayor? Let me get to this. But you have averred and alleged that there was some potential impropriety with the document itself that after the decedent said that she was going to distribute the remaining trust property to her son Daniel Cothern, there's a lack of punctuation, a large space there. What are you trying to say in that regard? Well, that's the argument for reformation due to mistake. If you, I believe it's Article 9 of the trust, there's a paragraph that states, I don't remember the exact, I don't have the exact quote right in front of me, but the remainder of the trust shall go to Daniel Cothern in all caps, and then the sentence just ends. There's no punctuation. I believe, as I stated in my brief, the only paragraph in the entire trust that ends in that manner without proper punctuation and just kind of ends halfway through the sentence. And it's our position that that leaves that open to some ambiguity and possible or at least a possible different reading of the intention of Ms. Cothern when she was drafted. I didn't realize that there was some type of alteration or fraud with the document. It was changed. There's missing pages, right? Oh, no, sir. Okay. All right. Counsel, you'll have an opportunity for replying. Thank you. Thank you very much. Mr. McCarthy. Thank you. May it please the Court, counsel? Counsel. I'm Jeff McCarthy. I'm appearing on behalf of Ms. Kelly Dan Cothern. I want to issue before we start, if you may, or if I may, in reading your brief, your statement of facts is brief, and generally we appreciate that. But your statement of facts after the first, like, three sentences is total argument. Why did you argue in your statement of facts, which is not permitted by the rules? I didn't perceive it as argument. Well, you said that all of the things about the relationships were not relevant. You didn't give us any facts. You just said what he said wasn't relevant. That's a pretty basic argument. When we're dealing with a 615 motion, Judge, we need to presume that all well-pled facts must be given weight. Okay. Well, that should be covered then in procedure, not in your statement of facts. And I'm simply saying if you do visit us again, and we hope you do, that you comply with the rule. Thank you. Thank you. As it relates to the specific facts of this case, we have to understand a couple things. Fifteen years passed between the time that Valerie Cothern signed her trust and her passing. Seventeen years passed between the time Kelly Formazan moved in with her mother and her mother's passing. During any point over those 15 years, had Valerie Cothern not wished to do what she had intended in the 2001 trust, she could have modified it, recognizing Ms. Formazan's facts, which aren't exactly true, but we must accept them as well-pled, that Mr. Cothern didn't have a relationship with his mother. He didn't, in fact. He didn't have a relationship with Kelly. And the problem was, once Kelly moved in, he no longer wished to visit the home, and Mom didn't want him to visit the home because of the conflict between son and daughter. Mom visited son at son's home. Mom visited son's family at son's daughter's softball games and son's son's football games. Was Mom able to get there independently, or did she need assistance, or did Daniel get her? Independently. She was a high school teacher at Elmhurst Shorts. She was the coach of the basketball team that went to the state championship. She's a very viral athletic woman. She didn't get ill until, what, 2015? She got cancer in 2013, but she wasn't incapacitated until immediately before her passing. Don't you agree, I mean, and the case law bears out that circumstantial evidence can be taken into consideration? I believe it can be, but I don't think there is circumstantial evidence here. I mean, the evidence that was presented by the appellant was that Dan had gone to his mother's house in the two years prior to the trust being executed and had enjoyed her pool. That Valerie had gone to... Did he enjoy her pool after she was executed? No, this was for the two years before. Right, but what about after? He, to a lesser extent, because Kelly was living in the house. That's when Kelly had moved in with her sons. Well, I thought she moved in in 1999, which would be two years before the execution of the documents. That's what I meant. For the two years before the execution, he was in the pool is what the allegation was. And Kelly was already there. And Kelly was already there, right. But from the standpoint of the simple allegations, there's no allegation that says, if Dan told Mom, cut Kelly out, give everything to me. In fact, Mom said, I'm giving 75% to Dan and the rest to my four grandchildren. In fact, has that ever occurred? No, the trust is in litigation. The grandchildren, Kelly's sons have filed a motion for accounting. In fact, the will has been filed in DuPage County. When did that happen? About six months ago. And so the state's been opened? No, it's a trust. So we're administering the trust. So was there a will plus the trust? Yes, it was a pour over. A pour over. Was the will consistent with the trust? Yes, completely consistent. I mean, the trust document itself is, I want to say, 40 to 50 pages long, quite extensive. And the attorney who prepared the trust, was there an affidavit from him? No, there's no affidavit from that attorney. There's no affidavit from any witnesses that witnessed Valerie signing the trust. There's no affidavit regarding any connection between Dan and that attorney whatsoever. The reality of it was is Mom was very aware that Kelly was living in her home. In fact, Kelly just moved out of that home about three months ago. Dan had allowed her to live in the home for the last three years with her children while this was all going on. And he's now undergoing getting the house into sale condition so that he can administer the trust properly. Counsel, let me get Buck Fisher. Go ahead. That being said, she understood that Kelly was benefiting while living. That Kelly was living in her home with her children, free. But how do you respond to his argument that at the time she prepared this trust, Kelly had only been there two years? How did she know that Kelly was going to be there ad infinitum, if you will? She didn't. She told Dan, well, there's nothing in the facts, but she told Dan that she was assuming that would be the case because of her knowledge of Kelly, of her knowledge of her daughter. And this wasn't about grinding an ax. This wasn't about Mom and Kelly having any issues. Mom loved Kelly. Mom loved Dan. Mom loved all the grandchildren. The fact of the matter is Mom was just recognizing that she gave Kelly a benefit for a period of time. Could she have changed it over the next 15 years? She absolutely could have. If Kelly moved out and she had gone on her own, she could have gone and changed it. I mean, we've seen trusts with varieties of amendments over 15 years, 15 amendments over 15 years. But she never did because she acknowledged that Kelly benefited while she was there. Bless you. And that Dan would essentially level the playing field by benefiting after her death. How did she acknowledge that? By drafting the trust the way it was drafted. Okay. So she never said that to anyone. And does the trust actually say that? Understanding that Kelly has lived in my house for these 16, 18 years or whatever the amount was, she has benefited and now it's Dan's turn. No. But it was only signed two years after she moved in. Right. I understand that. But what I'm saying is you're saying that the trust is the end-all and be-all, but it doesn't say anything to that effect, does it? It doesn't, but did it need to is the question.  Well, she could have done a number of things. She could have said, well, in light of Kelly's marriage to Rick Formazan, I want to hold off on giving her anything pending her divorce. And if she gets divorced, then I want her to get half and Dan to get half. But the children were still involved and they were still minors, correct? Yes, the children were very young. Colin is 18 and Jessica is 21, so that was three and six were Dan's children. And I believe the Formazan children are slightly older, maybe five and seven, five and eight at the time. He could have addressed it through the grandchildren. He could have skipped over Dan and Kelly, and she could have given it directly to the grandchildren. But she didn't. She said 6% to each child and the rest to Dan. She never didn't acknowledge her relationship with Kelly, because in the trust she says, I've got the daughter Kelly. But she doesn't make any disposition in her favor. In fact, had Dan not been able to receive, then the next in line would have been Sandy Cici, which was her best friend. So she was acknowledging that it was her desire to give her estate to Dan, and if not Dan, then somebody other than Kelly. And she probably, I mean, crafting a will or crafting a trust is always, you know, in hindsight, you could do something differently. Would it have been wise for somebody to have written, and to my daughter Kelly, I need nothing? Absolutely. Or I need one dollar? Absolutely. That isn't that what was troubling. Why didn't she just give a disinheritance vote? Because I don't think, well, it kind of goes back to all of these supposed conversations with Valerie over the years where she said, ah, you know, I'm going to give it to Dan and Kelly. She wanted to avoid the perspective that she was disinheriting Kelly until she was gone. It was somebody else's problem when she was gone. But if she had documents in her house that said, I intend to disinherit my daughter who's living with me, that might have caused a great deal of conflict. Seeing that she was knowledgeable of the fact that Dan and Kelly were in conflict. This touches on a whole theme here. We've asked a lot of questions about things that are sort of inferred or implied by the facts. But really, the overarching question here, the entire overarching question is whether the allegations of the complaint are sufficient to state a cause of action. We recognize that misrepresentations and concealment of facts can provide a cause of action under the secret influence case. Have you heard of that? Yes. So let me ask you a point of question. The plaintiff has alleged that, first of all, she and the decedent had a very close relationship, et cetera, et cetera. The defendant spent a lot of time with the decedent at or around the time the trust was executed. You've acknowledged that. And that the decedent executed the trust while the defendant had allegedly made misrepresentations specifically. The decedent was told by the defendant that the plaintiff would never be rid of her husband and would put the decedent in a nursing home. Those were the allegations, right? Correct. Are those not sufficient to state a cause of action?  If not, why not? Because ultimately, we've got a variety of thresholds that need to be met, and none of those thresholds have been overcome. First of all, is Dan telling Mom, Kelly's going to put you in a home? Well, then Mom would change her powers of attorney relating to her care while she was living. She wouldn't change her trust or her will disposing of her property after she was gone. She would ensure that Kelly wouldn't have the ability to move her into a home through any of these documents. Wasn't that something that would be fleshed out in the litigation? The powers of attorney issue? I mean, the arguments. I mean, what couldn't be fleshed out in the litigation? The reality of it is is what they needed to do was present sufficient allegations to support a claim, and these don't. There's no allegation of undue influence. There's no allegation that Dan's relationship with his mother was fiduciary in nature. The only relationship that they discussed was that Valerie got divorced in 1983 or 1993 from Glenn. She was depressed for a period of time. She drank to an extreme for a period of time because of the divorce, but she stopped drinking when Kelly moved into the house in 1999. There's no allegation whatsoever that Dan, and Dan at some point when he was at the pool, served his mom alcohol. There's no allegation that Dan served his mom alcohol, put her in the station wagon, drove her over to the Zion firm for them to execute the trust. There's no allegation that Dan did anything in relation to the trust whatsoever other than to visit his mom when his sister moved in, that he doesn't have a close relationship, to stop visiting his mom there. At the same time, the whole pool scenario, think of the ages of the children. As the children get older, they have other interests other than visiting grandma and swimming in her pool. They have baseball practice and softball practice and school. So none of that suggests in any way that Dan was influencing Valerie. There's no allegation whatsoever that Dan said anything to Valerie about her estate whatsoever. So when confronted with the allegation that the decedent and the plaintiff had a very good loving relationship, everything was fine, somehow she ends up being disinherited, you would respond and say that was due to what? That was a quid pro quo for having lived in the house without paying rent. And was that documented somewhere by the decedent? It didn't need to be. The decedent didn't want to draw a line in the sand between herself and her daughter. She wasn't asking for rent because she was benefiting by having her grandchildren in the house. And the reality of it is we don't know how they might have reacted had they known that she was saying, well, because you've been living here, I gave everything to Dan. Well, why would you find that to be? Sure, I understand disinheriting a child with a disinheritance clause could be somewhat insulting to the child, to the family. But according to what you just said, that would be a legitimate reason. If you could say that she felt that she gave her much of her inheritance because she lived there rent-free all of these years, wouldn't that have been a legitimate, not insulting way to soften the blow, if you will? It depends on the recipient's reaction. Let me ask you a question. Do you know whether your Kelly got divorced? I don't. I don't even think it's in any of the pleadings. It isn't. I think it is. I thought it was 01, but I couldn't be quoted on that. What about the fact that you said that if there was a document in the house that Kelly was aware of that might have said disinheritance goes to my grandchildren or my inheritance goes to my grandchildren, and, Daniel, she would be upset, did Kelly ever know what the terms of the trust were? According to her pleadings, she suggested that she only became aware of the trust documents immediately after her mom's death. Did she try to talk with her brother either before or after that period of time? No. Did her brother come in and take what, I mean, at this point everyone believes to be those legal documents? He did, and he came in. The allegations are that he came into the house within, I think, 18 hours or something after the death and removed a variety of important documents and expensive items. I hope it wasn't the Hummels. I think the Hummels were removed. I'm pretty sure. I think that was on their list. You can't get rid of them. I have a family that tried to collect beanie babies and thought they were going to get rich on that. Oh, yeah. But there was no discussion or anything like between Dan and his sister. So we don't really know what those documents are. In this litigation, they may be in some other litigation involved, but in this particular suit, we don't know what documents. Oh, the trust documents? Yes. The trust documents. Yeah, in fact, those are attached as exhibits to the complaint. Attached as to what he had received, but could there be more? Could there be more documents? Right, because of what she had said to Mr. McGill in conversations about Kelly and Dan will share. Could there be more? Has there ever been discovery on that issue? There has not. Okay. Thank you. Thank you. All right, Mr. Johnson. Thank you very much. To answer Justice Shostak's question, I don't know the exact year of the divorce, but it has to have been right around 2000 or 2001, because Austin was born in 1998, and I know she separated from Rick right when he was like six months old or so. So I don't know the exact date of the dissolution judgment, but it was when the children were very young. To address a few things Mr. McCarthy stated, the will being filed, frankly, that's news to me. I have not seen the will, a copy of a will. I have not seen any filings. I know he mentioned it was filed about six months ago in DuPage. I'll double-check when I get back to the office, but I have not seen anything to that effect. I don't know the date of the will. I would assume it's dated the same time as the trust, but I've yet to see that. But counsel said that you've attached the trust to the pleadings. Have you attached all the documents related to this dispute that you are aware of, that you've been given? Yes. And how did you get that trust document? Was it through some measure of discovery, or did they come to some resolution, or was it just a gentleman's agreement? Here it is. It was actually just kind of by good fortune. Kelly was cleaning out her—not necessarily cleaning out, but was looking for, I believe, a life insurance document in her mother's room and happened to stumble across the trust. This was when? Shortly after she passed. So did you then give the trust to Mr. McCarthy or whoever was representing Daniel at the time? I don't remember exactly how that occurred. I did get a copy of it, and then Daniel came to the house to get the trust, so he had his own copy, and then I assume he gave the trust to his attorney. But I don't remember exactly how all that— But at this point, those are the allegations that you've presented are this is the only document we know about, and there may have been a change based upon some of the conversations or some of the things that you've had heard by affidavit. Correct. And that's why we always refer to it as the purported trust because it's the one that we know of, and I certainly have no evidence standing here today that there is another one or any change that was made. But, again, I think throughout discovery, there would certainly be some questions about that and some interrogatory serve, deposition, testimony, et cetera. Based upon his argument, do you have anything else that you would wish to address? Yes, I would. Thank you. I think the key here, Mr. McCarthy made a comment about, well, there's no direct evidence of Daniel saying, well, I'm going to go take you over to the law firm and get this trust drafted for you. And I think that's probably the case in most situations because if there was direct evidence, then we wouldn't end up in litigation and an appeal, which is why the case law is very clear that you can use circumstantial evidence. And I think Mr. Justice noted that during the Appleby's argument that we have to look at, and this goes back to the Hoover standard, the totality of the circumstances and all the circumstantial evidence we have. Kelly living in the house in 1999 to 2001, which to me defeats this argument that, well, he didn't want to come to the house when Kelly was there because he was there all the time when Kelly was there for the two years before this trust was drafted. Then we have statements that are alleged in the complaint about this horrific relationship between Kelly and Rick and how if you don't get Rick out of your life vis-a-vis Kelly and the trust, he might inherit some of this money. We have statements from independent people such as Mr. Wargo, Mr. McGill, talking about conversations that he heard and statements that he heard over, I believe he said, 31 years that he's known the Firmizons, Mr. Wargo, that is. And looking at the susceptibility of Valerie, this being her son, the fact that Kelly is her daughter and had a loving relationship with her mother, had an expectation of an inheritance, and that they weren't treated equally at least up until, we believe, 2001 because it's Kelly's belief that she was a part of the will in 1994, although I don't know if she'd actually read every provision in that will. But we have two children. I'm assuming they both had good relationships with their mother at some point. And all of a sudden in 2001, a trust is drafted and one child who has a good relationship with her mother is now completely written out of it, although not specifically because there's no disinheritance clause. But obviously the effect of it is that when she passes away in 2016, everything's given to the grandchildren and to Danny. Did Kelly ever file a claim for caregiver costs in the estate? I know my time is up, but if you would allow me to answer that. I don't believe that to be the case, but I don't know. I haven't done that personally, and I don't know the answer one way or another. All right. If you want to sum up, you may do so and proceed. Or you don't have to sum up. It's up to you. No, thank you very much for the opportunity. Just very briefly, I think the allegations in the complaint do state a cause of action for undue influence and the other three counts that we did allege, reformation by mistake, tortious interference, and capacity. And again, in a 2-6-15 motion, we're on the pleading stage here. Taken as true, we feel that this case should at least get to discovery and proceed based on the allegations presented. And I certainly thank you for your time. Thank you. Thank you both, counsel, for being here this morning. We appreciate the argument. We will render a decision in due course.